THE HONORABLE BENJAMIN H. SETTLE

1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
8 AT TACOMA

9 LINDA STILLWELL and RICHARD          No. 3:11-cv-05117-BHS
STILLWELL, husband and wife and marital
10 community thereof,,                  DEFENDANTS' FIRST SET OF
                                        INTERROGATORIES AND REQUESTS FOR
11           Plaintiffs,                PRODUCTION OF DOCUMENTS TO
                                        PLAINTIFFS
12   v.

13 MULTICARE HEALTH SYSTEM, a
Washington Corporation, and SHARON
14 CHANCE and JOHN DOE CHANCE and
the marital community thereof,,

15
             Defendants.
16

17 TO:       Linda Stillwell and Richard Stillwell, Plaintiffs

18 AND TO:   Michael J. Davis, Attorney for Plaintiffs

19
        Pursuant to Rules 26, 33, and 34 of the Federal Rules of Civil Procedure, Defendants
20
MultiCare Health System (hereinafter "MHS"), Sharon Chance, and "John Doe" Chance submit
21
the following discovery requests to you, to be answered in writing and under oath, within thirty
22
(30) days after the date of service hereof.
23
        You are also requested to produce identified documents for inspection and copying at the
24
offices of Stoel Rives LLP, 600 University Street, Suite 3600, Seattle, Washington, or at such
25
other time and place as shall be mutually agreed upon by counsel.  Inspection and copying will
26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 1
(Cause No. 3:11-cv-05117-BHS)

70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 7 of 111

1   be conducted by Defendants' attorneys and their agents and will continue from time to time and

2   from day to day until completed.

3   ## GENERAL INSTRUCTIONS

4   In responding to these requests for production of documents, furnish such information as

5   is available to you, regardless of whether this information is obtained directly by you, through

6   your agents or representatives, or anyone acting on your behalf or on their behalf. If you cannot

7   respond to these requests for production in full, respond to the extent possible, specify the

8   reasons for your inability to respond to the remainder, and state whatever information or

9   knowledge you have concerning the unanswered portion.

10   Please note that certain of these discovery requests are continuing in nature. If you

11   obtain, directly or indirectly, additional information as defined by Federal Rule of Civil

12   Procedure 26(e) between the time your answers and responses are served and the time of trial,

13   you must promptly bring such information to Defendants' attention through supplemental

14   responses. If any such information or documentation is not furnished, Defendants may move to

15   exclude from evidence such information or documentation, or for other appropriate relief.

16   If your response to any request for production is "N/A" or "not applicable," describe in

17   detail your reasons for making such a reply.

18   Documents produced in response to Defendants' requests for production of documents

19   pursuant to Federal Rule of Civil Procedure 34 should be expressly identified by reference to the

20   request for production to which they pertain.

21   ## PRIVILEGE

22   If you claim any privilege with respect to any information called for by any request for

23   production or any part thereof, identify the type of privilege which is claimed, state the basis for

24   the claim of privilege, identify the communication, document or other item as to which the

25   privilege is claimed, and state the subject matter thereof. If you claim any such privilege, you

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 2
(Cause No. 3:11-cv-05117-BHS)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1   should nevertheless answer or respond to the interrogatory or request for production to the extent

2   that it calls for information as to which you do not claim a privilege.

### DEFINITIONS

4   The following definitions govern these requests, unless conclusively negated by the

5   context of the request.

6   1.   The word "person" refers to and includes any natural person, individual, firm,

7   association, partnership, joint venture, corporation, LLC, company, estate, trust, receiver,

8   syndicate, proprietorship, municipal or other governmental corporation or agency, including

9   groups and combinations of the same acting as a unit.

10   2.   The term "Plaintiff Linda Stillwell" refers in every instance to Plaintiff Linda

11   Stillwell and any or all persons and entities acting for Ms. Stillwell without limitation, attorneys,

12   employees, officers, agents, directors, independent contractors, successors, predecessors, parents,

13   subsidiaries, affiliates, and other persons and entities under the control of any of them.

14   3.   The term "Plaintiffs" refers in every instance to Plaintiffs Linda Stillwell and

15   Richard Stillwell and any or all persons and entities acting for Mr. and Ms. Stillwell without

16   limitation, attorneys, employees, officers, agents, directors, independent contractors, successors,

17   predecessors, parents, subsidiaries, affiliates, and other persons and entities under the control of

18   any of them.

19   4.   The term "MHS" refers in every instance to Defendant MultiCare Health System.

20   5.   The terms "you" and "your" refers in every instance to Plaintiffs as defined in

21   definitions number 2 and 3, above, and all persons and entities acting for Plaintiffs including,

22   without limitation, attorneys, employees, officers, agents, independent contractors, and other

23   persons and entities under the control of Plaintiffs.

24   6.   The term "document" is used in the broadest sense permissible under the Federal

25   Rules of Civil Procedure and is meant to include any medium upon which intelligence or

26   information can be recorded or retrieved and as used herein, refers to and includes, without

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 3
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

1    limitation, the original and each non-identical copy (whether non-identical because of alteration,

2    attachments, blanks, comments, notes, underlining or otherwise) of any "document," however

3    produced or reproduced, which "document" is in your possession, custody, or control or the

4    possession, custody, or control of your agent, servant, employee, including, without limitation,

5    the following:  whether in electronic or hard copy, agreements, contracts, proposals, bids,

6    memoranda, orders, letters, journals, notes, telexes, telegrams, billings receipts, invoices,

7    drawings, plans, rough notes, log books, diaries, reports, surveys, messages, summaries,

8    electronic mail or messages, or any other writings or tangible things on which any handwriting,

9    typing, printing, photostatic, or other form of communication is or are recorded or reproduced, as

10   well as all notations on the foregoing, including originals, all file copies, and all other copies of

11   the foregoing, together with all drafts on notes (whether typed, handwritten, or otherwise) made

12   or prepared in connection with such documents, whether used or not.  "Document" shall also

13   include, without limitation, any record of all or any portions of any discussion, communication,

14   agreement, conversation, interview, meeting, conference, conclusion, fact, impression,

15   occurrence, opinion, report or other similar matter, and shall include, without limitation, all

16   correspondence, papers, cablegrams, mailgrams, telegrams, notes, memoranda, summaries,

17   abstracts, worksheets, books, manuals, publications, engineering reports and notebooks,

18   schematics, engineering drawings, software source code listings, plats, charts, plans, databases,

19   diagrams, sketches or drawings, photographs, reports and/or summaries of investigations and/or

20   surveys, opinions and reports of appraisers or consultants, projections, corporate records,

21   minutes of board of directors or committee meetings, desk calendars, appointment books, diaries,

22   diary entries, emails, voicemails and notes, newspapers, magazines, or periodical articles, and

23   other record of any kind.  "Document" shall further include all aural or visual record or

24   representations, (including without limitation photographs, microfiche, microfilm, videotape,

25   sound recordings, and motion pictures) and computer, electronic, mechanical or electric records

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 4
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1   or representations of any kind (including without limitation, tapes, cassettes, discs, recordings,

2   programs, databases, archival records, etc.).

3        7.    "Electronically stored information" includes, without limitation, email, texting,

4   social media (Twitter, Facebook, MySpace and other social media), voicemail, documents,

5   spreadsheets, calendars, and any other information existing in any electronic format (e.g., Word,

6   Excel, Outlook, .pdf, HTML, .tif, .jpeg, .wav).

7        8.    The term "describe" and/or "describe in full detail" means to fully, faithfully, and

8   accurately set forth every fact and circumstance, including omissions, which in any way relates

9   to, refer to, reflect, comprise or bear upon a matter of inquiry.

10       9.    The term "relating to," "relates to" and "related to" means, without limitation,

11   comprising, concerning, containing, embodying, referring to, alluding to, responding to, about,

12   regarding, explaining, discussing, showing, describing, studying, reflecting, analyzing or

13   constituting.  A communication or document "relating" to any given subject means any

14   communication or document that constitutes, contains, embodies, reflects, identifies, states,

15   refers to, deals with, or is in any way pertinent to that subject, including, without limitation,

16   documents concerning the preparation of other documents.

17       10.    The terms "identify" and "identification" when used in reference to an individual

18   person means to state his or her full name, present or last known residence and business

19   telephone numbers, and present or last known residence and business addresses, if known, and

20   his or her present or last known title, position and business affiliation.

21       11.    The terms "identify" and "identification" when used in reference to a person other

22   than a natural person mean to state the full and official name of the business entity, its principal

23   place of business, and the main telephone number of such business entity.

24       12.    The terms "identify" and "identification" when used in reference to a document

25   mean to state its date, type (e.g., memo, telecopy, email), and its authors, addresses, title, if any,

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 5
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 11 of 111

1    and, if no title, a brief description of the subject matter of the document and its present or last

2    known location and custodian.

3        13.    The term "communication" or "communications" means any of the following: (a)

4    any written letter, memorandum or other document; (b) any telephone call between two or more

5    persons, whether or not such call was by chance or prearranged, formal or informal; (c) any

6    conversation or meeting between two or more persons, whether or not such a contact was by

7    chance or prearranged, formal or informal; and (d) any electronic mail, voice mail, telegraph,

8    tape or video recording, data message and any other method or medium of communicating

9    knowledge.

10        14.    The term "or" is used inclusively to mean "and/or."

11        15.    The term "Complaint" refers to the Complaint for Damages you filed in <u>Stillwell</u>

12    <u>et al. v. MultiCare Health System et al.</u> with the Superior Court for the State of Washington in

13    and for the County of Pierce, No. 11-2-05609-6, which case was removed to the United States

14    District Court for the Western District of Washington at Tacoma, No. 3:11-cv-05117-BHS.

15        15.    The term "TGH" refers in each instance to Tacoma General Hospital, operated by

16    Defendant MHS in Tacoma, Washington.

17        THESE DISCOVERY REQUESTS ARE CONTINUING IN NATURE, AND IN THE

18    EVENT YOU DISCOVER FURTHER INFORMATION THAT IS RESPONSIVE TO THESE

19    DISCOVERY REQUESTS, YOU ARE TO SUPPLEMENT YOUR ANSWERS AND

20    RESPONSES.

21

22    **<u>INTERROGTORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS</u>**

23

24    **<u>INTERROGATORY NO. 1:</u>** Please identify all individuals who may have knowledge

25    of facts relevant to any of the claims or defenses raised in this litigation, and, as to each such

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 6
(Cause No. 3:11-cv-05117-BHS)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

70847029.1 0023502-00065

1   individual, identify the individual's current address and telephone number, describe the

2   substance of the relevant information regarding which the individual may have knowledge, and

3   identify whether you anticipate calling the individual as a witness at trial.

4       **ANSWER:**

5

6   1. Linda Stillwell   615 N. Sheridan Ave.     Registered Nurse, Certified in Adult/

                Tacoma, WA. 98403       Medical Nursing

7                253 627 6144

8         LS  has knowledge of all her claims. How LS treated patients and fulfilled her

9           commitment to her Employer, TGH (MHS).  LS has knowledge of her

10           damages.

11

12   2. Cherie Griffith  14118 141st Ave. KPN    Registered Nurse

13             Gig Harbor, WA. 98329

               253 884 5352    Work # 253 403 1106

14         CG  has knowledge of the Plaintiff's skills, knowledge, professionalism

15          and CG has knowledge of Manager, SC' s discriminating, bullying and

16          disparity in treatment suffered by LS.

17

18   3. Sharon (Cheri) Cochrane   4507 60TH Ave. W.     Registered Nurse

19           University Place, WA. 98466

              253 564 0637   Work #  253 403 1106

20         S©C  has knowledge of the Plaintiff's skills, knowledge, professionalism

21          and has knowledge of Manager, SC' s discriminating, bullying and the

22          disparity in treatment suffered by LS.

23

24   4. Linda Radawick                    Registered Nurse

25            Spanaway, WA.

               253 531 8541   Cell:  360 458 1317  Work # 253 403 1106

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 7
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

Exhibit 1, Page 13 of 111

1      suffered by LS.

2

3    9. Marina Podolskaya            Registered Nurse  ( works at

4                           Good Samaritan Hospital

                       Puyallup, WA.

5      MP  has knowledge of Plaintiff's skills, knowledge, professionalism and

6      has knowledge of Manager, SC' s discriminating, bullying and the

7      disparity in treatment suffered by LS.

8

9    10. Tammy Wiggins           Registered Nurse

10            Moved to Arkansas 2010

            TW has knowledge of Plaintiff's skills, knowledge, professionalism and

11      has knowledge of Manager, SC' s discriminating, bullying and the disparity

12      in treatment suffered by LS.

13

14    11. Rhonda Davis            Registered Nurse

15

16

17          Work #  253 403 1106

          RD  has knowledge of the Plaintiff's skills, knowledge, professionalism and

18      has knowledge of Manager SC' s discriminating, bullying and the disparity

19      in treatment suffered by LS.

20

21    12. Filipina (Fia) Lumanlan        Registered Nurse

22

23          Work #  253 403 1106

          FL  has knowledge of the Plaintiff's skills, knowledge, professionalism and

24      has knowledge of Manager SC's discriminating, bullying, and the disparity

25      in treatment suffered by LS.

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 9
(Cause No. 3:11-cv-05117-BHS)

70847029.1 0023502-00065             STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1
13. Kim Armstrong      6346 SE Autumn Lane      Registered Nurse

2
                       Olalla, WA. 98359

3
                       253 857 3652      Work # 253 403 1032

4
          KA has knowledge of the Plaintiff's skills, knowledge, professionalism and

    has knowledge of Manager, SC's discriminating, bullying and the disparity

5
    in treatment suffered by LS.

6

7
14. Amie Nichols                         Registered Nurse

8

9
              Work #  253 403 1115

10
              253 241 4104

11
              253 761 2197

          AN has knowledge of the Plaintiff's skills, knowledge, professionalism and

12
    has knowledge of Manager SC's discriminating, bullying and the disparity in

13
    treatment suffered by LS.

14

15
15. Hanna Welander    575 Andover Park West Suite 101      Nurse Representative

16
                      Seattle, WA. 98188

17
                      206 575 7979 Ext: 3035

          HW has knowledge of the Plaintiff's skills, knowledge, professionalism and

18
    has knowledge of Manager, SC's discriminating, bullying and the disparity in

19
    treatment suffered by LS.

20

21
16. Sally Baque       6346 SE Autumn Lane      Registered Nurse

22
                      Olalla, WA. 98359

23
                      253 857 3652      Work #: 253 403 1024

          SB has knowledge of the Plaintiff's skills, knowledge, professionalism and

24
    has knowledge of Manager, SC's discriminating, bullying and the disparity in

25
    treatment suffered by LS.

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 10
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1    17. Amber French    4312 Brookdale Rd E    HUC (Secretary)

2    Tacoma, WA. 98446

3    253 414 3973    Work # 253 403 9530

4    AF has knowledge of the Plaintiff's skills, knowledge, professionalism and

has knowledge of Manager, SC' s discriminating, bullying and the disparity in

5    treatment suffered by LS.

6

7    18. Robin (Erlichman) Finnick    8410 Northway SW    Patient Care Technician

8    Lakewood, WA. 98498    (PCT)

9    253 861 0167    Work # 253 403 1106

10    R(E)F has knowledge of the Plaintiff's skills, knowledge, professionalism

and has knowledge of the Manager, SC' s discriminating, bullying and the

11    disparity in treatment suffered by LS.

12

13    19. Sandy Lucus    Patient Care Technician  (PCT)

14    Retired  December 2010

15    253 970 9373

16    SL has knowledge of the Plaintiff's skills, knowledge, professionalism

and has knowledge of the Manager, SC' s discriminating, bullying and the

17    disparity in treatment suffered by LS.

18

19    20. Wendy Taylor    P. O. Box 7620    Patient Care Technician (PCT)

20    Tacoma, WA. 98417

21    253 759 3290

22

23    WT has knowledge of the Plaintiff's skills, knowledge, professionalism

and has knowledge of the Manager, SC' s discriminating, bullying and the

24    disparity in treatment suffered by LS.

25

26    21. Lakisha Davis    5530 Boston Ave. SW  D2    Patient Care Technician (PCT)

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 11
(Cause No. 3:11-cv-05117-BHS)

STOEL RIVES LLP
ATTORNEYS
70847029.1 0023502-00065    600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1    Lakewood, WA. 98499

2    LD has knowledge of the plaintiff's skills, knowledge, professionalism

3    and has knowledge of the Manager, SC's discriminating, bullying and the

4    disparity in treatment suffered by LS.

22. Elisa Garza          915 6th Ave. TCM          Physician Assistant

5    Tacoma, WA. 98405

6    253 403 7277

7    EG has knowledge of Plaintiff's skills, knowledge, professionalism and

8    has knowledge of Manager SC's discriminating, bullying and the disparity in

9    treatment suffered by LS.

10

23. James Fry            315 M. L. .K Jr. Way          Physician   (Retired July 2011)

11   Tacoma, WA. 98405

12   253 403 4844

13   JF, Plaintiff's personal Physician, has knowledge of Plaintiff's skills,

14   knowledge, professionalism and has knowledge of Manager, SC's

15   discriminating, bullying and the disparity in treatment suffered by LS.

16

24. Karen Nelson         314 M. L. K. Jr. Way  #400          Physician

17   Tacoma, WA. 98405

18   253 627 0666

19   KN, Plaintiff's personal Physician, has knowledge of Plaintiff's skills,

20   knowledge, professionalism and has knowledge of Manager, SC's

21   discriminating, bullying and the disparity in treatment suffered by LS.

22

25. Jennifer Permann     314 M. L. K. Jr. Way  #400          Physician Assistant

23   Tacoma, WA. 98405

24   253 627 0666

25   JP, Plaintiff's personal Physician Assistant, has knowledge of Plaintiff's

26   skills, knowledge, professionalism and has knowledge of Manger, SC's

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 12
(Cause No. 3:11-cv-05117-BHS)

70847029.1 0023502-00065

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA. 98101
*Telephone (206) 624-0900*

Exhibit 1, Page 17 of 111

1    discriminating, bullying and the disparity in treatment suffered by LS.

2

3    26. Virginia Stowell      3124 S. 19th Street  Ste #220    General Surgeon Physician

4                            Tacoma, WA. 98405      253 301 5050

5         VS, MD, FACS, has knowledge of Plaintiff's skills, knowledge,

6         professionalism and has knowledge of Manager, SC' s discriminating,

7         bullying and the disparity in treatment suffered by LS.

8    27. Diane Cecchettini     315 M. L. K. Jr. Way       C.E.O. TGH/ MHS

9                            Tacoma, WA. 98406    253 403 1000

10        DC, C.E.O., has knowledge of Plaintiff's skills, knowledge, professionalism

11        and has knowledge of Manager, SC' s discriminating, bullying and the

12        disparity in treatment suffered by LS.

13

14

15

16

17   **REQUEST FOR PRODUCTION NO. 1:** Please   produce   all   documents   and/or

18   electronically stored information that reflect, describe, support, or relate to your response to

19   Interrogatory No. 1 above.

20   **RESPONSE:**

21

22

23

24   **REQUEST FOR PRODUCTION NO. 2:** Please   produce   all   documents   and/or

25   electronically stored information that reflect, describe, support, or relate to your allegations in

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 13
(Cause No. 3:11-cv-05117-BHS)                    STOEL RIVES LLP
70847029.1 0023502-00065                              ATTORNEYS
                                        600 University Street, Suite 3600, Seattle, WA 98101
                                                 Telephone (206) 624-0900

1   Paragraph 2.9 of your Complaint that Plaintiff Linda Stillwell "received numerous

2   commendations, thank yours [sic], and positive comments from the patients and their families

3   whom she cared for."

4   **RESPONSE:**

5

6

7

8   **INTERROGATORY NO. 2:** Please describe each and every instance when you raised,

9   filed, submitted, or lodged complaints, concerns, or allegations with Defendant MHS or its

10  employees regarding: (1) "the amount of work that [you] and [your] co-workers were required to

11  complete;" (2) you and your co-workers "becoming overwhelmed" with "the implementation of

12  a new electronic charting system known as EPIC;" (3) "the increased number of patients and

13  their increased acuity needs;" (4) your alleged inability "to take breaks and lunches;" (5) "unsafe

14  working conditions;" and/or (6) "issues relating to the safety of patients and the stress on

15  [MHS's] employees," as alleged in Paragraphs 2.12 through 2.18 of your Complaint. As to each

16  such instance, provide the date/s on which you raised such concerns, the individual/s with whom

17  those concerns were discussed, and the substance and outcome of each such discussion.

18  **ANSWER:**

19

20      I will state that I complained a number of times regarding breaks and lunches, working

21  conditions that were unsafe, and other issues that I felt resulted in safety concerns for staff and

22  patients. I cannot recall at this time all of the conversations, and I believe there are more than I

23  have listed, but I attempt to provide as many as I can recall at the present time below. I believe

24  there were many additional times when I mentioned these issues.

24  1. DATE: November 2008, Staff Meeting

25      INDIVIDUAL discussed concerns with: S.C., Manager

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 14
(Cause No. 3:11-cv-05117-BHS)

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*
70847029 1 0023502-00065

1    INSTANCE: Manager stated to myself and SSU/SAU staff, "I want all of you to know my

2    door is always open to hear any concerns you have". I spoke at meeting concerning learning the

3    new Epic system of documentation was stressful and that I was doing my best to not make any

4    errors. I presented that lack of breaks and missed lunches made it more likely to make mistakes.
     I complained of lack of breaks and missed lunches.

5    OUTCOME: The Epic System continued in the process of being implemented. Constant

6    changes and additional ways to utilize screens in Epic continued. Breaks and lunches continued

7    to be missed without reimbursement.

8

9    2. DATE: December 11, 2008  LS requested meeting

     INDIVIDUAL discussed concerns with: SC, Manager and TL, Director
10
     INSTANCE: I reviewed with my Managers my concern of being assigned patients with
11
     increased acuity needs as well as how that impounded myself and my Co-Workers. I provided
12
     example of my work assignment to show especially how the number and types of medications
13
     the patients received  indicated the various medical conditions they were receiving treatment for.
14   Only two out of my  six assigned patients were actually Ambulatory Care Unit acuity patients. I

15   reported that Doctors had stated to me such remarks as, 'Why is my patient here when they need

16   a longer recovery time?, and "What is going on?". I presented that the additional time it took to
     enter documentation in Epic and the dual documentation of the Discharge process (both in Epic
17
     and paper documentation) was causing overtime.
18
     OUTCOME: No immediate change. Ratio of patients to RN was addressed by end of
19   February, 2009 and was documented  in Management's response  March 31st, 2010

20   to Grievance LS filed 12/2/2009 for Termination without Just Cause , quote, "work load issues

21   were also brought to SC by several of Linda's peers. The concerns prompted SC to lower the

22   Nurse to patient ratio on the unit from 8 patients to 1 RN to 5-6 patients to 1 RN. Of Note: This
     came two months after LS had brought concerns to Manager and that all staff became verbal in
23
     the January, 2009 staff meeting.
24
     3. DATE: December 2008 Staff Meeting
25
     INDIVIDUALS to who and with whom discussed: SC, Manager
26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 15
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

Exhibit 1, Page 20 of 111

1    INSTANCE: SC reported to staff that audit of the Emar documentation in Epic would be on

2    going. LS raised concerns as to the patient to RN ratio and the increased acuity needs (more

3    medical conditions in addition to the surgical needs each had) were causing more overtime,

4    patient safety issues, increased possibility of errors, and increased stress levels for all staff.

     OUTCOME: No change

5

6    4. DATE: January 22, 2009

7    INDIVIDUALS with who or whom concerns were discussed: SC, Manager

8    INSTANCE: LS met with SC per LS's request to discuss work assignment. LS was assigned

9    to partner with a PCT who was floated into the unit and the PCT was not trained in the Epic

10   documentation for the SSU/SAU. LS reported concerns about increased acuity of the patients,

11   lack of breaks and missed lunch, increased time documentation required, forced overtime, and

     that patient safety could be impounded due to increased likelihood of mistakes. LS reported that

12   patient's safety was dependent on her and her Co-workers. LS, being her units WSNA

13   Representative, expressed concerns staff had expressed about being overwhelmed due to an

14   inordinate amount of stress on a daily basis. LS expressed that she had longevity with many of

15   the staff (10-20 years average) and testified to the character and attributes of her Co-workers. LS

16   expressed that several of the staff felt little support from management during such a challenging

     period of time.

17   OUTCOME: When LS requested that concerns be submitted in writing, SC responded that

18   concerns would be noted and presented to Director, TL. When LS requested that SC initial

19   written documentation of LS's work assignment on 1/22/2009, SC declined.

20

21   5. DATE: February 5th, 2009

22   INDIVIDUAL/S CONCERNS DISCUSSED: SC, Manager, TL, Director

23

     INSTANCE: LS was reviewed as to 1/21/2009 patient's wife being upset when asked to "sit in
24
     chair or leave the room" on patient's arrival to room from PACU (Post Anesthesia Care Unit)
25   and 2/4/2009 when per SC young patient's mother alleged complaint that LS had been

26   dismissive to her. LS responded that on 1/21/2009 no AM or PM break had been taken and that

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 16
(Cause No. 3:11-cv-05117-BHS)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900
70847029.1 0023502-00065

1   impounds delivery of care and that LS was in process of assessing patient's breath sounds and

2   due to patient's wife talking with her husband it was preventing that crucial assessment to be

3   accomplished and LS responded that young patient's mother was exhausted per her own

4   statement that she had not been able to get any sleep and that she was upset that her son had a 6

hour wait in the ED (Emergency Department) and that she expressed that she had little faith in

5   her son's Doctor's attentiveness and that LS had not been dismissive to her concerns and

6   emotional needs and that in fact, the Manager was requested to intervene to hear this mother's

7   frustrations with her son's hospital experience. LS reported that increased acuity needs of

8   assigned patients made it difficult to meet the needs of the Ambulatory patient population.

9   OUTCOME: LS was told to review MHS policy on behavioral expectations and was directed to

10   report each shift to SC, Manager before 12 Noon on the discharge status of each of her assigned

11   patients.

12

13   6. DATE: February 6th, 2009

14     INDIVIDUALS with who or whom concerns were discussed: SC, Manager and TL, Director

15   INSTANCE: LS was issued a STEP III Discipline for the omission of medication

16   documentation in the Emar record in Epic. There was no medication error. The 5 rights of

17   medication administration were followed correctly. There was no harm to the patient. The date

of the omission on this one patient (after a period of Emar audit extending from October, 2008 to

18   present) was January 30th, 2009 and less than 30 days since the end of the orientation period for

19   the implementation of the new electronic chart. In the Discipline it is written that failure to

20   document prn (as needed) narcotic administrations places the patient at risk of receiving

21   additional doses of narcotics which could result in respiratory compromise. Per Pyxis (the

22   machine that stores the medications on the unit), this patient's medications were obtained at

23   09:20AM and per documentation in Epic, this patient was discharged to home with stable vitals

and baseline neurological status at 10:35AM. In this patient's hospital course there was no

24   possible "WHAT IF" due to the fact he was discharged after one hour of receiving his ordered

25   medications (of record the medications this patient received were not new to him, having a ten

26   year history of narcotic medical intervention and a baseline of high narcotic tolerance). In the

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 17
(Cause No. 3:11-cv-05117-BHS)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

70847029.1 0023502-00065

1   STEP III Discipline it is written that "this progressive guidance was imposed after investigation

2   was done". LS asked why no progressive action, WHY A MOST SEVERE DISCIPLINE

3   WHEN NO PRIOR STEP I OR STEP II? LS asked why being disciplined on the worst outcome

4   when that WHAT IF could not and did not occur with this patient? LS asked if every RN, who

    had omitted entries in the Emar and had not followed MHS Medication Administration Policy,

5   were issued a STEP III Discipline.

6   OUTCOME: No change in management's choice to issue to LS the most severe of Disciplines.

7   No real investigation by management. LS presented that the day of this omission was a Saturday.

8   The other facts are as follows: 1. There is decreased staff assigned to work on Saturday shift. No

9   HUC, therefore ,no one at desk to answer phones or enter charges. No Housekeeping staff on

10  duty to assist with transfer and discharge of patients. The Housekeeping staff come after all

    patients are gone or come in on Sunday and clean prior to the unit reopening on Monday. 2. LS

11  was orientating RN, RD, to Saturday routine of how to close the unit, how to enter charges and

12  how to correctly capture the total hours each patient's stay totaled.

13  3.Presented that patient received correct medications, correct dosages, correct time, correct route

14  and to the correct patient. 4. Patient was never at risk. 5. Patient was discharged over one full

15  hour after receiving his ordered medications, and the patient was

16  discharged with stable vital signs and baseline neurological status as documented in Epic.

    6.No staff followed LS due to this patient discharged to home. 7. There was no prior omission of

17  documentation of any administered narcotic by LS prior to 1/30/2009 even with audit of Emar

18  since October, 2008. 8. LS HAD NO PRIOR STEP I OR STEP II OR STEP III (None issued

19  since transferring in to Unit in September, 2005 and none throughout the 25 years prior to that).

20  LS followed after RN staff that repeatedly omitted entering documentation of narcotic and

21  medications in the Emar and these staff members did not receive STEP III Disciplines per their

22  own testimony and per documentation provided to WSNA.  LS' s emotional outcome from this

23  discipline was an overwhelming feeling of being singled out and targeted. LS experienced a

    hostile work environment and felt silenced from expressing any further concerns about

24  workload, forced overtime, lack of breaks and missed lunches, and patient safety issues. LS felt

25  that her Manager was determined to eliminate LS' s top of the pay scale wage that LS was at due

26  to longevity with TGH (MHS). It brought back to mind the statement SC had stated at the very

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 18
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 23 of 111

1   first staff meeting (when SC was introduced), that her prior management experience was in

2   Banking and that with the 3 separate mergers that had taken place, she was the one who "fired

3   people". It is fact, by reducing the Budget on the Unit, SC receives a larger Bonus and gains

4   greater recognition.

    7. DATE: February 13, 2009

5   INDIVIDUAL/S to whom concern discussed: SC, Manager

6   INSTANCE:  Brief exchange where LS was told of need for continued daily reporting to SC of

7   the discharge status of her assigned patients before 12 Noon.

8   OUTCOME: LS responded that she was compliant with Management's directive and that had in

9   fact paged Manager to provide report when Manager was not on the Unit. LS asked if all RN

10  staff that had Overtime were asked to comply to this directive. No response given by SC to this

11  inquiry.

12  8. DATE: June 10th, 2009

13     INDIVIDUALS TO WHO AND WITH WHOM DISCUSSED: SC, Manager, and NO,

14  Manager of PACU.

15     INSTANCE: On May 6th, 2009 LS was assigned a Student Nurse to precept ( of note LS was

16  not paid preceptor pay for this shift). On May 6th, 2009 the Student Nurse, CH, lodged a verbal

17  complaint against, Plaintiff, LS. Student Nurse, CH, was asked by SC, Manager, to write a letter

    of complaint. Between May 6th, 2009 and June 10th, 2009 there were no verbal or written

18  complaints made by any patients, family members or students that LS had any contact with. On

19  June 3rd, 2009 SG, Manager informed LS that due to Managements decision to switch assigned

20  Saturday shift (for no reason other than Management's choice) that since this switch would result

21  in LS working two consecutive Saturdays, Management could take LS off the schedule for June

22  13th, 2009. LS responded "I need to work my assigned FTE hours". On June 10th, 2009, 34 days

23  after Student Nurse, CH's complaint, SC with Director, TL's support, issued a STEP III

24  Discipline to LS for: Failure to follow behavioral expectations, Patient safety violation, Failure

    to create a positive learning environment and Failure to follow the 5 rights of medication

25  administration. No prior STEP I or STEP II progressive discipline had been issued. In this

26  Discipline, reference was made to January 21st, 2009 when LS had asked a patient's wife, on the

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 19
(Cause No. 3:11-cv-05117-BHS)                    **STOEL RIVES LLP**
                                                        ATTORNEYS
70847029.1 0023502-00065              600 University Street, Suite 3600, Seattle, WA  98101
                                              Telephone (206) 624-0900

1    patient's arrival out of PACU (Post Anesthesia Care Unit), "sit down or leave the room so she

2    could finish her assessment of the patient". Of fact, LS had been given report on this patient's

3    condition from the PACU RN and had been informed that this patient had emesis (threw up)

4    when he was extubated (air way removed) and that his lungs were moist throughout and that his

5    oxygen saturation was impaired. LS, as per her Registered Nurse responsibility to this patient,

6    needed to assess his baseline on presentation to the Unit. It was alleged that LS' s request was

7    the primary reason that this patient's wife was worried and upset. Also, in this Discipline,

8    reference was made to February 4th, 2009 when LS was accused by a young patient's mother (per

9    SC) of being "dismissive in her behavior towards her". It is of record that SC continued to assign

10   this patient to LS for care for two more shifts following his mother's alleged statements. It is fact

11   that PCT,SL had asked SC to intervene for this mother due to her expressing her frustration that

12   her son had a 6 hour wait in the ED (Emergency Department) while he was in pain and that at

13   07:24AM (when this instance took place), the mother had had no sleep (her son had arrived to

14   the Unit at 01:30AM after Surgery and PACU) and the mother had expressed to LS that she had

15   "no faith in her son's Doctor's attentiveness". This mother's response was to LS when ,after the

16   patient had had an emesis (threw up gastric contents and had scant amount of blood on tissue

17   when he blew his nose), tried to reassure the mother that LS was going to go contact the patient's

18   Doctor and give a condition report and find out when the Doctor was going to see her son. The

19   patient's mother was speaking to LS as LS was in the patient's bathroom flushing the emesis

20   down the toilet. After continuing to care for this patient and his mother, both expressed to LS

21   their appreciation to her for her care and interventions on the young patient's behalf. As to the

22   Student Nurse's letter of complaint, it is written that CH had not seen patient's Emar, yet the

23   computer was open to this patient's chart in the Medication room where both LS and CH were

24   present and LS directed CH to the information. The patient's medication, Ancef, was on the

25   screen, the route IV (intravenous) was viewed and the time of administration noted and the dose

26   of 1gram noted. It is from this information on the computer, in the Medication room, that the

27   Student Nurse, with LS' s supervision, was able to mix the medication into a 50cc bag of Normal

28   Saline solution and label the bag with the patient's name, room number, the date, the time, the

29   name of the medication and the dose, prior to entering the patient's room. The Student Nurse

30   alleged that LS logged her out of the patient's chart in the patient's room. The Student Nurse

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 20
(Cause No. 3:11-cv-05117-BHS)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900
70847029.1 0023502-00065

1  wrote that LS did not let her do the 5 rights of medication administration until after discussion in
2  the patient's room that if the Student Nurse would feel more comfortable with her Instructor
3  present that would be fine. LS based that on her experience that many times due to a student's
4  anxiety the student learns best with their Instructors. The facts are the 5 rights of medication
5  administration were followed as evident in the documentation in the Emar. The Student Nurse,
6  CH, manifested to LS that she was nervous. LS did not engage with CH in an angry manner, and
7  LS 's only intention was for the Student Nurse to have "hands on" clinical experience. CH had
8  spent two hours on the computer at the Nurse's station and had left the ward twice for extended
9  periods of time. It was after 01:00PM, and CH had received very limited clinical experience by
10  that time. Student Nurse, CH, wrote that she had remained in the room with the patient, whereas
11  LS 's testimony is that LS remained with her patient and communicated with her patient as to
12  what had transpired. LS expressed to her patient that I was sorry that I was not effective in
13  allaying this student's anxiety. The patient expressed to LS that she could see that she was trying
14  to help the student. LS expressed to the patient how I wanted the student to benefit from doing
15  the process of identifying the patient, administering the medication using the 5 rights, checking a
16  saline lock ,priming the tubing and setting the pump as well as documentation in the Emar. The
17  patient stated to LS she saw how the student did not seem to be reassured and receptive. The
18  patient's safety was never at risk. LS conducted herself in a professional manner with a very
19  nervous and inexperienced individual. In responding to this Discipline, LS asked, "Do all staff
20  receive a STEP III Discipline without receiving a STEP I or a STEP II Progressive Discipline
21  and do all staff receive a STEP III Discipline based on patients being distraught (four months
22  prior) and a Student Nurse being anxious?". SC also issued with this Discipline a 3 day
23  suspension without pay that correlated to the Management's assigned consecutive Saturday shifts
24  for LS( thus eliminating consecutive pay for LS).This made it economically better for SC's
25  budget by not paying LS consecutive Saturday's pay that is stipulated in the contract between
26  WSNA and TGH.. No other staff received Discipline before June 10th, 2009 for these type of
   alleged events, even though there were complaints ,that LS and Management were aware of
   ,concerning other staff members from patients and their families. LS' s emotional outcome from
   this discipline was an overwhelming feeling of being singled out and targeted. LS experienced a
   hostile work environment and felt silenced from expressing any further concerns about

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 21
(Cause No. 3:11-cv-05117-BHS)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900
70847029.1 0023502-00065

Exhibit 1, Page 26 of 111

1 workload, forced overtime, lack of breaks and missed lunches, and patient safety issues. LS felt

2 that her Manager was determined to eliminate LS' s top of the pay scale wage that LS was at due

3 to longevity with TGH (MHS).

4 OUTCOME: Again, threat of Termination and disparate treatment. Again, LS feeling

5 discriminated towards due to age and being at the top of wage scale. LS had over 30 years

6 employment with TGH during which LS provided teaching to a multitude of Student Nurses,

new hires, return to duty hires, and Agency staff. LS had never had any verbal complaints or

7 written complaints. In fact, LS received verbal and /or written appreciation with each occasion.

8 On June 11th, 2009, LS filed a Discipline Without Just Cause Grievance. It was at this time that

9 HW, WSNA Nurse Representative, stated to LS, "SC is going to fire you. Why don't you quit,

10 find a new, better place to work and go on with your life and be happy?". LS put trust in WSNA

11 ,despite this ,to represent her and remove the STEP III Disciplines that were not warranted, were

12 not progressive as agreed upon in the contract between WSNA and TGH and were, in fact,

examples of Management treating LS NOT IN ACCORDANCE to TGH' s Patient Safety

13 Culture, TGH' s Corporate Compliance or TGH' s Code of Conduct.

14

15 8. DATE: August 7th, 2009

16 INDIVIDUAL to whom discussed concerns: SC, Manager

17 INSTANCE: SC presented LS with her yearly job Performance Evaluation. LS discussed with

SC that she had had no complaints since February 4th, 2009 from any other patient's families and

18 never any complaints from patients and no further Student Nurse complaints since the one

19 complaint made on May 6th, 2009. LS discussed that the remainder of May, all of June and July

20 there was sustained improvements in all areas (no medication errors or omissions also) and

21 again, never any harm to any patient assigned to LS for their care. SC, Manager informed LS that

22 the reason a STEP III Discipline was issued 2/6/2009 was not due to LS' s  omission in the

Emar, but that it was that the patient was not made to remain in the hospital after taking his

23 prescribed narcotics. LS asked SC, Manger, how long patient would have had to remain in the

24 hospital? SC responded that LS needed to have patient agree to remain one hour after he received

25 his medications. LS asked if there were any written policy to follow for this situation. There is no

26 written policy. LS asked, "What if that made the patient and his wife angry?" SC instructed LS

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 22
(Cause No. 3:11-cv-05117-BHS)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

70847029.1 0023502-00065

1   that she only needed to document her reasons in the Nurse's Notes and that would counter any

2   written letter of complaint. LS asked SC to review this patient's chart because LS knew that the

3   medications were given at 09:20AM and the patient was discharged to home at 10:35AM (this

4   patient had remained over one hour).

5   OUTCOME: No review of documentation in patient's chart as requested by LS. In LS's

6   Evaluation , LS was evaluated at Level 1 (lowest) for "Purse Excellence and Creativity and

7   Promote change to make things better" despite fact that LS maintained her continuing education

8   (stood out on the Unit for having her Certification in Medical/Surgical Nursing). LS was

9   evaluated at Level 1 for "Take responsibility for Service & Quality" despite fact that on a daily

10   bases LS strove for excellence, did no harm and maintained safety precautions and procedures.

11   LS was evaluated at Level 1 for "Show respect for the people and the Organization" despite fact

12   that LS had no complaints from families since February 4th, 2009 and no further complaint from

13   any Student population and had showed sustained improvement and had never received any

14   complaint from any patient assigned to her for care. LS expressed to SC that she was in

15   disagreement with the Evaluation and that by signing it she was only acknowledging that she had

16   received it. SC stated to LS at that time, "With your 30 plus years you should consider retiring".

17   LS's emotional outcome from this discipline was an overwhelming feeling of being singled out

18   and targeted. LS experienced a hostile work environment and felt silenced from expressing any

19   further concerns about workload, forced overtime, lack of breaks and missed lunches, and patient

20   safety issues. LS felt that her Manager was determined to eliminate LS's top of the pay scale

21   wage that LS was at due to longevity with TGH (MHS).

22   9. DATE: November 19th, 2009

23   INDIVIDUAL TO WHOM DISCUSSED CONCERNS: SC, Manager

24   INSTANCE:  LS discussed with SC concerns about the actions of PCT, LC with whom LS

25   was partnered with for 3 shifts. PCT, LC, was in new position working the Ambulatory side of

26   the Unit. The following was presented:  1. November 13, 2009: LS was in an Isolation room

providing care to the patient when LC opened the door, stood in the doorway, and began to

discuss another patient's needs. LS directed her to go to the charge RN, CJ, to get assistance. LS

wanted HIPAA regulations adhered to. 2. November 18, 2009: PCT, LC, stated to RN, CJ, who

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 23
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 28 of 111

1   was Charge Nurse, that LS had directed her to review (Room 428) discharge instructions with

2   the patient. The Charge Nurse discussed this with LS since the PCT role does not include

3   reviewing home instructions. CJ, Charge Nurse, stated that since PCT, LC, was new to working

4   on the Ambulatory side perhaps LC did things differently on the Short Stay side. CJ also stated

5   she thought it was unusual that LS would have changed her practice. LS stated to CJ that LC had

6   not been directed to go over Discharge Instructions with the patient. On this same shift, PCT,

7   LC, left the Ambulatory Care Unit and went out of the building and down to the corner to take a

8   patient's prescriptions to the Multicare Pharmacy. PCT, LC, who was partnered with LS, never

9   told LS or any staff person that she was leaving. When LC returned, LS spoke with LC privately

10   and requested that if she were leaving the Unit she needed to report off. LC replied, "No worry,

11   it was my lunch break". 3. November 19th, 2009:  PCT, LC, did not follow through with "plan of

12   care" as directed by LS during AM report session as to ambulation of assigned post-operative

13   patients. These examples were given: Room 420: LS asked patient, at the time discharge

14   instructions were being reviewed, how had she tolerated ambulating in the hall? And the patient

15   responded that no one had assisted her to walk out in the halls since 04:00 AM (it was 12 noon

16   when the discharge was about to take place).  Room 422:  This was the first time that this patient

17   had ever had surgery. When LS asked how this patient was tolerating walking in the hallway, she

18   responded that no one had offered to walk with her and she did not feel safe walking by herself.

19   LS ambulated patient full distance of hallway with stand by assist.  Room 424:  Patient told LS

20   that she had not been assisted to walk in the halls. She said she had been helped up to sit in a

21   chair. LS ambulated patient with stand by assist full distance of hallway and was concerned that

22   perhaps due to patient's lack of activity (PCT not following plan of care) was not the reason she

23   failed her Voiding Trial and had to have a Foley catheter replaced.

24   4. November 19th, 2009: LS discussed with SC, Manager, that the two Housekeeping staff, MB

25   and IT, had come to LS due to fact LS was partnered that shift with PCT, LC and expressed that

26   they were unhappy due to being treated in a rude manner when PCT, LC interacted with them

concerning "beds being made up faster" (BEDS REQUIRE A CERTAIN LENGTH OF TIME

TO DRY) and also concerning the food in the pantry. LS told SC, Manager that LS directed both

of the staff to go to SC, Manager with their concerns and also to express their feelings directly to

PCT,LC whenever she interacted with them in a negative manner.

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 24
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 29 of 111

1   OUTCOME:  SC stated to LS that SC was investigating a complaint and planned to have

2   meeting with LS on 11/20/2009 after her shift. LS inquired as to what the complaint was about

3   and SC told her it was not to be discussed at this time. LS stated concerns as listed. SC, Manager

4   stated to LS, "You can discuss concerns with me at any time." SC then stated to Plaintiff, LS,

    "Linda, you are a good Nurse.

5

6   10. DATE: November 20, 2009

7   INDIVIDUAL with whom discussed concerns: SC, Manager

8   INSTANCE:  LS had the following concerns that were discussed with SC, Manager at

9   approximately 1400. These concerns were concerning additional actions of PCT, LC who was

10  partnered with LS this shift that were inappropriate: 1. PCT,LC came into Room423 while LS

    was documenting in Epic and began to discuss another patient's care. LS had to exit out of Epic

11  and go out into hall and again ask LC not to discuss other patient's needs in front of another

12  patient. 2. PVT,LC came into Room 424 while LS was engaged in reviewing this patient's

13  Discharge Instructions and started to talk with LS about the patient in Room 423. LS had to

14  excuse herself from patient and go out into the hall and again request that LC should only say, "I

15  need to ask you a question or tell something", and I can respond in a timely manner and that

16  HIPAA rights are maintained.  3. Patient in Room424 stated to LS that PCT,LC "shoved ice pack

17  down her back" while she was sitting in the upright position in the bed and that "it hurt" (the

    type of ice packs on 4JII, due to the size of the ice, cannot be over filled and the only way the ice

18  pack should be applied to post op back patients is to position the patient on their side with a

19  pillow between their legs and place the ice pack against their dressing and placing another pillow

20  to their back to support the ice pack and keep it in place). The patient expressed to LS, "I didn't

21  want to argue with her." 4. The patient in 423 told LS, "the PCT, LC made me use the I.S.

22  (Incentive Spirometer) EVEN when I told her I had just done my breathing exercises. She

    intimidates me."

23  OUTCOME:  SC listened. Restated to LS that meeting would take place after 15:30 .

24

25  11. DATE: November 20th, 2009

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 25
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1   INDIVIDUALS to who and with whom discussed concerns: SC, TL, AN (WSNA

2   Representative), SB (WSNA Representative)

3   INSTANCE:  Meeting took place at 15:45. LS was informed that PCT, LC and C.N.A..TK,

4   stated to SC that LS put pressure on patient's ( Room 415-2 ) post-operative ankle and that they

    did not hear LS say she was sorry. LS responded that she did say she was sorry and that causing

5   discomfort to the patient caused LS to feel distressed. LS reported that she went in 415-2 to

6   communicate to LC (LS' s assigned partner) that since it was 11:45AM and LS had no AM

7   break, LS wanted LC to know she was taking lunch break and that LS wanted LC to check on

8   patient in 420 who had requested assistance when lunch trays were pasted. LS expressed that at

9   no time were HIPAA Regulations not adhered to. LS expressed that she had no information as to

10  what type of surgery the patient in 415-2 had since this patient was on the Short Stay side and

11  that the bed was in the high position and it was unintentional that LS' s arm came in contact with

    the patient's foot. LS reported that she raised the covers and assessed the operative site (to make

12  sure her inadvertently placing pressure had not caused any bleeding or injury)  and that there was

13  no bleeding noted and the toes were pink and warm to touch.

14  OUTCOME: LS submitted written response to concern.

15

16  12. DATE:  November 20th, 2009

17  INDIVIDUAL/S TO WHOM DISCUSSED CONCERNS: SC, TL, AN,SB

18  INSTANCE:  SC presented to LS that PCT,LC had told her that LS does not adhere to HIPAA

    rules and that makes LC feel uncomfortable. LS responded that LS does adhere to HIPAA

19  regulations. LS responded that LS repeatedly had instances where LC did not follow HIPAA

20  guidelines and that these concerns were discussed with SC on 11/19/2009 and 11/20/2009. SC

21  did report that as part of her investigation she had interviewed four patients and that none of

22  them had recalled any "of those types of conversations taking place in front of them" as LC had

    alleged.

23  OUTCOME: LS submitted written response that stated, "It is not my practice to discuss other

24  patient's needs (private information) in front of patients".

25

26  13. DATE: November 20th, 2009

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 26
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065                                   STOEL RIVES LLP
                                                                ATTORNEYS
                                          600 University Street, Suite 3600, Seattle, WA  98101
                                                      Telephone (206) 624-0900

1   INDIVIDUAL/S TO WHOM DISCUSSED CONCERN:  SC, TL, AN, SB

2   INSTANCE:  SC stated that LS had interrupted PCT, LC, during a personal phone call she was

3   having while on duty at the Nurse's Station. SC  reported that LC had gotten special permission
    from SC to engage in this call.
4
    OUTCOME:  It was presented by AN and SB and LS, that when on duty and a staff member
5
    needs assistance to help a patient ,the person who is requested to help is the staff member's
6
    assigned partner. LC was LS' s assigned partner ,and it is practice that if a staff member is on a
7   personal call while on duty, that call needs to be interrupted. It was asked, " Why was LS, LC' s

8   assigned partner, NOT informed of this phone call that SC, Manager had given LC permission to

9   receive?"

10
    14. DATE:  December 1st, 2009
11
    INDIVIDUALS concern discussed with: SC, Manager, TL, Director
12
    INSTANCE:  Management met with LS at 06:50AM (on the AM of LS' s  assigned shift) and
13  stated to her, " It was a difficult decision, but you are terminated from your employment at TGH

14  immediately. You must hand over your Badge and clear out your locker and do not go onto

15  Unit". LS asked for reason for Termination and the only response was " it was a difficult

16  decision". LS 's only additional comment was, "You have not seen any good in my service?" and

17  when asked if LS had any papers with any patient's private information, LS offered for
    Management to see the contents of her locker and her bag.
18
    OUTCOME:  TL informed LS that the Management had 7 days to provide her with the reason/s
19  for her Termination. LS put her request in writing and had it notarized by Human Resources

20  Department. LS filed a Grievance for Termination Without Just Cause on December 2nd, 2009.

21
    15. DATE:  December 7th, 2009
22
    INDIVIDUAL concerns were discussed with: DC, CEO OF MHS
23
    INSTANCE:  DC, CEO OF MHS  granted 15 minute meeting that was extended to 45 minutes.
24  LS presented her appreciation for the privilege of serving at TGH for 31 years and  thanked her

25  CEO for being such a wonderful role model and positive force for the Community. LS presented

26  her concern as to SC's, with TL's support ,maintaining an environment that was punitive and

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 27
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

Exhibit 1, Page 32 of 111

1   threatening and that LS was discriminated against due to her age and wage. LS presented to her
2   CEO that there was no gross negligence on her part and no willful misconduct.
3   OUTCOME: DC,CEO expressed shock at the notification. that the Nurse she knew of
4   personally to be dedicated and held in high esteem ,was being separated from her employment
    with TGH. DC, CEO stated she would "look it to this".
5   If it were not due to my age, my union activity, and my complaints, and the retaliation that came
6   as a result of those complaints, and the discipline that came as a result of those complaints, it is
7   my belief that I would still be employed.
8
9
10
11  **REQUEST FOR PRODUCTION NO. 3:** Please produce all documents and/or
12  electronically stored information that reflect, describe, support, or relate to your answer to
13  Interrogatory No. 2, above, including, but not limited to, any and all written complaints,
14  concerns, or allegations that you filed, submitted, or provided to Defendant MHS or its
15  employees.
16  **RESPONSE:**
17
18
19
20
21  **REQUEST FOR PRODUCTION NO. 4:** Please produce all documents and/or
22  electronically stored information that reflect, describe, support, or relate to your allegations in
23  Paragraph 2.12 of your Complaint that you were "not able to take breaks and lunches as required
24  under Washington law."
25  **RESPONSE:**
26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 28
(Cause No. 3:11-cv-05117-BHS)

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

70847029.1 0023502-00065

1

2

3

4    **INTERROGATORY NO. 3:** Please describe each and every instance when you raised,

5    filed, submitted, or lodged complaints, concerns, or allegations during your employment with

6    MHS that you "though that Ms. Chance was singling [you] out for unfair and disparate

7    treatment." As to each such instance, provide the date/s on which you raised such concerns, the

8    individual/s with whom those concerns were discussed, and the substance and outcome of each

9    such discussion.

10    **ANSWER:**

11

12    1. DATE: November 13th, 2009: Singled LS out as being "the problem". LS requested
        to meet with SC due to concern as to how Traveler RN, RJ, had spoken to LS

13       in front of a patient and his family.

14    INDIVIDUALS WITH WHOM DISCUSSED: SC, Manager, TL, Director, RJ, Traveler

15    RN

16    INSTANCE: RJ, who LS had witnessed on four occasions upset his patients and their

17    families (including events where Hospital Representatives had been called in to intervene), had

18    told LS ,in front of patient and patient's family, to leave patient's room.
        TL, with SC' s agreement, told LS, "you should ask RJ what "he wants you to do " when his

19    patient's call for help". LS had presented to management that she was at the Nurse's Station

20    when a family member for the patient in Room 423 asked for assistance. LS offered to get the

21    assigned Nurse and the family member replied that the assigned Nurse had been asked 3 times

22    and had not assisted the patient. LS went in Room 423 and assisted the patient (as LS' s training

23    and practice for over 30 years was "all patients are every ones concern and a response of "that is

24    not my patient" has never been acceptable).
        In the meeting, LS asked the question as she had been directed to and RJ responded, "Do not

25    help my patients. TL, with SC' s agreement, stated, "Linda, there is your answer".

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 29
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 34 of 111

1    OUTCOME:  LS was treated as if her concern held no merit. LS was not valued for her

2    professional judgment. True patient advocacy requires that Nurses confront their peers and

3    promote professional practice in all environments. LS had never been taught to advocate only for

4    those patients assigned to her. LS felt singled out as the problem, whereas, LS' s goal had always

5    been to be part of the solution. Following this meeting, Dr. William Morris, Dr. Peter Brown and

6    Dr. Anthony Harris informed Management that Traveler RN, RJ, could not be assigned to their

7    patients. As a result of this, all RN' s, on the Ambulatory Care Unit, had their daily assignments

8    adjusted to accommodate caring for these Physicians' patients. Also, RJ announced that SC

9    "wrote a letter to my Agency critical of my performance and now the assignment I had lined up

10   to do after my contact is done here at TGH has been cancelled". Even with SC' s critical

11   evaluation of RJ's performance and safety, RJ was allowed to finish his contracted weeks with

12   TGH.

13   2. DATE:  December 10th, 2009. LS was singled out as not providing Discharge Instructions

14   "fast enough".

15   INDIVIDUAL/S TO WHOM CONCERNS DISCUSSED:  SC, Manager

16   INSTANCE:  LS was at Nurse's Station making a "Real Time" documentation in Epic when

17   SC told LS in harsh, critical manner "go discharge your patient in 428". Then  SC stated " IF you

18   are not going to discharge your patient NOW, find someone else to do it!".

19   OUTCOME:  I requested and was granted a meeting with SC after the end of my shift. LS

20   stated to SC that her assignment was well organized, that her patient's duplicate Discharge

21   Papers were ready and that LS' s patient's discharge from the hospital was accomplished in a

22   safe and timely manner. LS requested that SC not INCREASE  LS' s STRESS (learning Epic is

23   stressful!) and that LS would appreciate that if SC had found that LS had in fact delayed her

24   patient's discharge, that SC would discuss this event with LS after SC knew it had OCCURRED.

25   SC responded "I know I tend to just say things as  I am thinking it or I tend to forget". LS never

26   observed or was provided testimony that SC interacted with any other RN on Duty in that

     manner during the length of time SC was  LS' s Manager (September, 2008 - November, 2009).

     The following RN's testified to LS that they were not treated in this manner and had never been

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 30
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 35 of 111

1    directed to stop a Real Time entry in Epic to do a task NOW:  RN, LR  RN,S©C  RN,RD

2    RN,FL,  RN,CJ .

3

4    3. DATE: January 9th, 2009.  LS was singled out as to being responsible solely for not getting to
     take breaks and lunch.

5        INDIVIDUAL/S TO WHOM CONCERNS DISCUSSED:  SC

6        INSTANCE:  SC stated to LS, "the reason you don't get a break is you "can't let go", "you

7    don't ask for help", you are too set in your ways".  LS never witnessed or was provided

8    testimony that SC spoke with another RN or judged any other RN in that manner. LS

9    interviewed the following Co-Workers:  RN, LR,  RN, S©C  RN, RD  RN,FL  RN,CJ  RN,DD

10   RN,ZC. LS was knowledgeable of RN staff not getting to take their paid two 15 minute breaks or
     their 30 minute lunches.

11   OUTCOME: LS perceived that SC was treating her in a disparate manner and that SC dismissed

12   the factors that were the true reasons for missed breaks and lunches: increased acuity needs of

13   the patients SC accepted on the Ambulatory Care Unit, increased length of time documentation

14   in the new Epic system required, the increased length of time it took to complete the changed

15   Discharge process, and the increased patient/RN ratio assignments that SC had implemented.

16

17   4. DATE: January 21st, 2009:  LS was singled out by SC as sole cause of a post-operative
     patient's wife being upset.

18   INDIVIDUAL/S TO WHOM DISCUSSED CONCERN:  SC, Manager,  TL, Director

19   INSTANCE: LS was told by SC that LS had upset patient's wife when LS asked her to allow LS

20   to assess her husband on his arrival from the PACU (Post Anesthesia Care Unit). LS reported to

21   SC that LS observed the patient's wife greet her husband while he was on gurney in hallway and

22   gave him a kiss. When patient was moved into his bed, PCT, R(E)F,  DIRECTED PATIENT'S

23   WIFE TO WAIT IN THE HALL and explained that staff needed to work with patient and
     needed to get him "Returned". PCT, R(E)F, FINISHED obtaining vital signs and obtaining

24   patient's type of Full Liquids he would like and left room as LS was then instructing the patient

25   about the Pain Scale and between 1-10 with 10 the most severe asking where he was on this

26   scale. LS was in process of instructing patient on the importance of taking Deep Breaths, not

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 31
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1   only to improve his lung status post anesthesia but in his particular situation from the Report LS

2   had received from the RN in PACU, due to his having had an emesis (threw up) as his airway

3   was being removed, he was at greater risk with moisture and wheeze audible in his upper

4   quadrants. The patient's wife came into room and was asking her husband questions when LS

5   requested of the wife to "have a seat ". The patient's wife left the room. PCT,R(E)F, came into

6   room and reported to LS that she had asked TL, Director, to intervene for the patient's wife due

7   to the patient's wife crying. LS thanked partner and proceeded to do what a competent RN must

8   do and that is evaluate a patient's Baseline and try to provide for the patient the best foundation

9   for successful recovery from the effects of anesthesia and best possible health outcome. LS ,

10   after the patient 's condition was assessed, then went to the patient's wife ,who was standing in

11   the hall and up next to the wall and reported to her that her husband was doing well and ,at that

12   time ,LS offered to get her juice and was sorry she had been detained.

13   OUTCOME: LS discussed with SC and TL events that had taken place and LS put in writing the

14   events as she knew them to be. June 10th, 2009, five months later, in a STEP III Discipline

15   given to LS, with no prior STEP I or STEP II, this event was written up by TL and SC. LS had

16   personal knowledge and had witnessed other patients and patient family members expressing

17   anger and emotions concerning other RN staff, and no other staff had received any STEP III as

18   Discipline. TL alleged in this Discipline that the patient stated, "RN showed a non-caring

19   attitude". LS reported that she only worked with this patient on his return to Unit (due to it being

20   close to change of shift) and that in addition to total body assessment, LS had expressed her

21   concern for his wellbeing, had provided him with oral care, had instructed him in use of the

22   Incentive Spirometer and Deep Breath and Cough and had obtained a warm blanket for him from

23   the Blanket Warmer. LS requested of TL and SC to consider that the patient's wife could have

influenced his comment. Of the RN staff that LS was witness to and was known by SC and TL

where other patients and their family members were upset and angry, (examples of patient's

upset: RN, RD,  and  RN,CJ ) received no Discipline of any kind.

24   5. February 3rd, 2009:  Singled LS out as not making the right assignments on Saturday shift

25   when in Charge position.

26      INDIVIDUAL/S WITH WHOM CONCERN DISCUSSED:  SC, Manager

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 32
(Cause No. 3:11-cv-05117-BHS)

70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1    INSTANCE:  LS spoke with SC and expressed that she was not able to take 15 minute breaks

2    or lunch during the Saturday shift due to the added responsibility of orientating the other RN on

3    duty to entering charges in Epic and the routine for closing the Unit and due to the acuity of the

4    patients.

5    OUTCOME: SC stated to LS "you should not be in Charge position since you do not make out

     the assignments correctly".  LS responded that the assignment of LS taking six patients with the

6    PCT and assigning the second RN, RD, who was new to the Saturday position (enabling RD to

7    be successful at entering charges and learning the tasks needed to close the Unit) to Primary Care

8    for three patients was made in accordance to the established practice by all RN's on the

9    Ambulatory Care Unit. LS presented that she had participated in this practice since September,

10   2005. SC informed LS that the correct way the assignment needed to be made was to divide the

11   patients between the two RN's and assign the PCT on duty all nine patients for care (stating, "the

     patients can go home for their shower or have their hygiene needs provided on the Unit they

12   were transferred to"). LS requested that if Management wanted to change the established staff

13   assignment practice by the RN in the Charge position on Saturdays, would SC please inform all

14   staff of this change.  The following weekend (February 7th, 2009) neither RN on duty (LR and

15   S©C) had been informed of this change by SC. The Manager, SC, had informed PCT, R(E)F, of

16   the change in her assignment on Saturdays to provide care to all patients on the Unit. On

     February 7th, 2009, PCT, R(E)F, informed the RN's on duty of SC's instructions as to how the

17   assignments were to be made.  PCT, R(E)F, stated to LS that when SC told her of the staff

18   assignment changes SC stated to her "the reason for the change was due to Linda Stillwell's

19   complaint".

20

21   6.  DATE:  February 4th, 2009:  Singled LS out as the sole reason patient's Mother was upset.

22       INDIVIDUAL/S TO WHOM DISCUSSED CONCERN:  SC, Manager

23       INSTANCE:  SC stated to LS that "the Mother of your patient told me you were "abrupt and

     dismissive in your behavior towards her".  LS was rounding on patients and at 07:45 AM, LS

24   was with patient and his Mother in Room 425. The patient had had an Appendectomy. The

25   patient, age 17, was withdrawn and overtly sad. The patient's Mother expressed to me her

26   frustration at the length of time (over six hours) her son had waited in the ED (Emergency

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 33
(Cause No. 3:11-cv-05117-BHS)

STOEL RIVES LLP
ATTORNEYS
70847029.1 0023502-00065                                         600 University Street, Suite 3600, Seattle, WA 98101
                                                                Telephone (206) 624-0900

1   Department) while in pain. The Mother stated that "I have had no sleep. My son just returned to

2   his room just after 01:30AM". The Mother's frustration and anxiety increased when after her

3   son had been assisted up to the bathroom, on return to bed, he had an emesis (threw up) in the

4   emesis basin and then when he blew his nose there was a scant amount of blood on the tissue.

5   The emesis was gastric contents. While LS was flushing the emesis down the toilet in the

6   patient's bathroom, the patient's Mother was talking and LS could not hear due to the noise of

7   flushing the toilet. LS asked the Mother what had she said and the Mother appeared on the verge

8   of tears. LS expressed to the Mother that the Doctor would be notified right away and a condition

9   report given. LS tried to reassure the Mother that having an emesis after having received

10   Anesthesia was not unusual and many times a person feels much better. The patient was

11   examined and questioned as to any continued feeling of nausea. The Mother stated to LS that "I

12   have no faith in my son's Doctor's attentiveness". LS' s partner, PCT,SL, entered the room and

13   remained with Mother as LS went to Nurse's Station and paged the patient's Surgeon. PCT, SL,

14   after listening to Mother's frustration with the Medical Management of her son, went to SC,

15   Manager, and asked her to provide support. LS felt feeling of relief that the Mother was

16   receiving counseling and a means to express their feelings further. After spending time with the

17   patient and his Mother, SC spoke to LS in a critical manner, stating "you should have provided

18   more support for this family", "this young man is facing a huge disappointment due to the fact he

19   is now unable to participate in the Wrestling Tournament this coming Saturday and he was

20   expected to be the State Champion".

21   OUTCOME: SC assigned this young patient to LS for the following two days that he was

22   hospitalized, right up to and including, his Discharge Instructions. The patient's Mother

23   expressed no further concern in regards to LS and ,in fact, both the patient and the patient's

24   Mother expressed their appreciation and thanks for LS' s care and interventions. Then five

25   months later, June 10th, 2009, the event where this patient's Mother was so overwrought with

26   worry and lack of sleep, was written up in the STEP III Discipline issued by SC to LS. This

STEP III Discipline, the most severe of Disciplines, was given without any prior Progressive

Disciplines (neither a STEP I or a STEP II). Progressive Discipline is what is agreed upon

between the Union, WSNA and MHS and is put forth in the Contact that was current for 2008

and 2009. In the Discipline it is written, LS has not "CHANGED YOUR BEHAVIORS AND

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 34
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 39 of 111

1  NURSING PRACTICE". Yet there were no subsequent complaints and no nursing practice

2  errors.

3

4  7. DATE: February 5th, 2009: Singled Out LS to report to Manager each shift prior to 12 noon
   and give discharge status report on LS' s assigned patients.

5  INDIVIDUAL/S TO WHOM CONCERN DISCUSSED: SC, TL

6  INSTANCE: SC gave LS directive to report directly to her the discharge status of the patients

7  assigned to LS and to do so daily and ongoing. This SC wrote was " due to the expectation that

8  missed lunches and end of shift overtime for LS would be reduced and that to ensure "that

9  patients are receiving safe and quality care". No other RN on the Unit had this expectation

10  placed on them even though majority of staff had overtime and missed breaks and lunches and

11  other Nurses and staff had patients express complaints concerning their treatment. As record,

12  pertaining to the issue of missed breaks (without receiving reimbursement) and missed lunches
    (without reimbursement), MHS was being investigated by Washington State's Department of

13  Labor during 2008 and 2009, and as of October, 2010, a lawsuit was filed by the Nurse's Union,

14  WSNA, against MHS for violation of Fair Labor Laws.

15

16  8. DATE: February 6th, 2009  Singled out LS by SC, with TL support ,for LS' s one and only
    omitted medication and narcotic entry in Epic for one patient by issuing a STEP III Discipline

17  (no Progressive Discipline, no STEP 1 or II, no medication error).

18  INDIVIDUAL/S WITH WHOM CONCERN DISCUSSED:  SC AND TL

19

20  INSTANCE: LS' s omission of documenting the medications "given as ordered" to the

21  patient in Room 428 occurred on January 30th, 2009, less that 30 days of the completion of the

22  orientation to the new electronic chart called Epic. LS had one year experience in the electronic
    documentation of medications administered ( known as Emar). Documentation can be

23  challenging on a daily basis, and LS' s record of successful documentation in the Emar for her

24  multitude of patients over a year period of time and working 32 hours per week reflects that LS

25  maintained MSH Medication Administration Policy, and reflects that LS had , throughout 30

26  years employment with TGH,  never had any Patient Safety Violations.  LS reported to her

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 35
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1 Management that on the day of the omission of the patient's medications in the Emar, LS was
2 entering an array of information into the various screens in the Epic that pertained to the
3 following: Nurse's Note, Wound Assessment and Treatment, Pain Level and Treatment, Home
4 Instructions (patient teaching), Valuables Documentation. LS ,in addition to maintaining the 5
5 Rights of Medication Administration (the Right Patient, the Right Drug, the Right Dose, the
6 Right Route, and the Right Time), was reviewing the Discharge paperwork with the patient and
7 his wife. LS presented to Management that at the time of the omission of the correct medications
8 to the patient, the acuity of the patients was high, LS was in Charge of nine patients and
9 providing direct care to six patients with PCT partner and was providing orientation and
10 instruction to her RN Co-Worker, RD, since it was the first Saturday shift RD had worked. LS
11 instructed RD on how to close the Unit by 15:30PM and how to enter Charges and how to
12 capture number of hours (Length of Stay). LS assisted with RD' interventions to ensure that the
13 discharged patients and the transferred patients (to Extended Care Facility or In-House Bed)
14 occurred in a Timely manner and thereby prevented Overtime. An additional factor on the
15 Saturday shift, there is reduced staff no Unit Clerk (HUC) at the desk to answer phones and call
16 lights, and no Housekeeping Staff available to assist with transfers and discharges due to the fact
17 Housekeeping Staff always do their cleaning on Saturdays after all the patients are off the Unit.
18 On Saturdays, at this period of time, there was no assigned Hospital Transporter, as there is
19 during the week that could be utilized to assist. Concerning LS' s non-willful act of not entering
20 the Medications administered in the patient's Emar, there was no medication error, the 5 Rights
21 were followed, there was no harm to the patient, there was no potential harm to this patient (the
22 patient was discharged to home one hour after receiving his prescribed medications thereby no
23 RN followed LS, thereby, no possibility of giving additional doses). LS did no gross negligence
24 or willful misconduct.

25 OUTCOME: SC and TL issued a STEP III Discipline without giving any progressive
26 discipline prior. LS had no prior omission of narcotic administration. LS asked her Managers,
27 "DO ALL Nurses receive a STEP III Discipline with a first omission and when there was no
28 harm to the patient?" LS asked her Managers, "Has every Nurse who has failed to follow MHS
29 Medication Administration Policy been given a STEP III Discipline?" LS reported to her

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 36
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 41 of 111

1  Managers that the patient's wife was witness to the patient receiving his prescribed medications
2  and that LS opened each medication in front to the patient and his wife and identified each
3  individual medication as it was administered. LS restated that there was no medication error and
4  the 5 Rights of medication administration were followed. LS reported that in the patient's chart
   and per the patient's testimony it is documented that none of the prescribed medications were
5  new to the patient. This patient had a ten year history of chronic pain due to a MVA (Motor
6  Vehicle Accident). The procedure performed on 1/29/2009 was a Spinal Cord Stimulator
7  insertion to treat chronic pain for pain relief that has a poor response to narcotics. This patient
8  had documented high narcotic tolerance and at time of his discharge, the patient had stable Vital
9  Signs and his neurological status was at his baseline. The patient had been assessed by his
10 Physician and had a written order for discharge to home. LS requested that the chart be reviewed
11 to prove LS's testimony  that the medication was given at 09:20AM (documented in the Pyxis
   record ) and was discharged to home at 10:35AM (documented in the Epic record).
12
13 ADDITIONAL OUTCOME:  During the August, 2009 Performance Evaluation that SC gave to
14 LS, SC stated to LS that the reason the most severe Discipline was given to LS on February 6th.
   2009, was not that LS had omitted the entry in the patient's Emar, it was that patient went home
15 too soon after he had received the medications. SC informed LS that LS should have made the
16 patient agree to remain in the Hospital for observation before giving the medications. THERE IS
17 NO HOSPITAL POLICY THAT STATES THAT PATIENTS WHO ARE GIVEN THEIR
18 PRESCRIBED MEDICATIONS AND ARE MEDICALLY STABLE AND HAVE A
19 WRITTEN DISCHARGE TO HOME HAVE TO MEET A CRITERIA OF "WAITING TIME"
20 AFTER ADMINISTRATION OF MEDICATIONS.  LS inquired ,"What if this directive made
   the patient and his family angry?" SC stated to LS it would be their choice to write a letter of
21 complaint and that would be OK and all LS would need to do was state in the Nurse's Note (in
22 Epic) that the reason his discharge was delayed was for his wellbeing. LS inquired as to how
23 long patient would be asked to stay after receiving his prescribed medications (again there is no
24 "Wait Time Policy") and SC informed LS, one hour. LS asked SC TO REVIEW PATIENT'S
25 CHART.

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 37
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 42 of 111

1    Even though LS is well acquainted to receiving thank you's from the hundreds of patients she has

2    provided care for over 33 years, this patient and his wife's comments of praise were such that LS

3    was actually distracted with an overwhelming feeling of emotion. This strong emotional

4    response that LS experienced ,she believed was due to the intensity of the new Epic system and

5    how that was impounding herself and all RN staff and due to the critical and bullying manner

6    both SC and TL were manifesting towards her after LS had brought the concerns of increased

7    patient acuity on the Unit, lack of breaks and missed lunches and concerns for patient safety and

8    increased likelihood of errors. This patient and his wife expressed to LS their appreciation "for

9    the excellent care he had received". They stated to LS, "We have been in so many Hospitals and

10   this is the best experience we have ever had". LS had stated to them in reply, "I think a great deal

11   of the credit goes to RN, DD, who worked with you the last 16 hours ( DD was on a mandatory

12   Double Shift due to the fact there was no 11-7 shift RN coverage). The patient, with his wife's

13   agreement, stated to LS, "It is you and your expert care that has met all the expectations we have

14   always felt should be met." The STEP III Discipline was not changed. No other RN received

15   STEP III Discipline even though LS was aware of other RN's that omitted in the Emar

16   medications they administered and the documentation of all the RN's omissions were captured

17   due to the audit conducted by SC and presented to the WSNA Union's Nurse Representative,

18   HW. In TGH' s Administrations response to the Grievance Discipline Without Just Cause LS

19   filed February10th,2009, SM stated in writing, "LS had several meetings with SC reviewing LS'

20   s lack of using the 5 Rights of Medication Administration in November, 2008 and SC had more

21   meetings with LS in December,2008 in regards to Medication administration and that LS

22   continued to miss vital documentation." This is SIMPLY NOT TRUE.  There were not any

23   omissions in documentation of narcotics prior to January 30th, 2009.Truly, where was patient

24   safety compromised for THIS patient who received the Right medications, the Right doses, the

     Right route and the Right time and the Right patient and who remained in the Hospital one hour

     after receiving his prescribed medications and who had been assessed and discharged to home by

     his Physician and patient was discharged with stable Vital Signs and baseline Neurological status

     intact and was exceedingly happy with his Hospital stay at TGH?

25

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 38
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1   9. DATE: February 6th, 2009 SC  Singled Out LS by stating to her Co-Workers at the Nurse's

2   Station, "LS' s working is not an option."

3       INDIVIDUAL/S WITH WHOM CONCERN DISCUSSED:  Per R(E)F testimony:  SC, all 7-

4   3 staff and all 3-11 staff

5

6       INSTANCE:  On February 6th, 2009 3-11 shift needed RN coverage due to ill call. SC asked

7   all RN  7-3 staff if anyone would work a Double shift to provide coverage for the needed 3-11

8   shift. All declined. Staff put forth LS' s name, due to the fact that on multiple occasions LS

9   would willingly cover staffing needs of TGH and her Unit.  SC announced at the Nurse's Station,
    "LS 's working is NOT AN OPTION."

10  OUTCOME: There were a  multitude of times following February 6th, 2009, when both SC and

11  TL REQUESTED and had LS WORK Management requested Overtime (especially, requesting

12  LS to come in to Duty at 03:00AM instead of her usual scheduled 07:00AM start time). It is fact

13  that DC, CEO of MHS, personally witnessed and gave thanks to LS for coming on Duty at

14  03:00AM on an occasion in May.2009 when there was an emergency on the Ambulatory Care
    Unit.

15

16  10. DATE: February 13th,2009  Singled Out LS to report to SC (each shift worked) prior to

17  12Noon and give discharge status report on LS' s assigned patients.

18      INDIVIDUAL/S TO WHOM CONCERN DISCUSSED: SC

19

20      INSTANCE:  SC again spoke to LS of her directive to report to her daily by 12 Noon. LS was
    compliant with this directive and paged SC  whenever SC and TL were not physically on the

21  Unit .

22

23      OUTCOME:  Overtime and missed breaks and lunches continued for majority of staff, yet LS
    was the only staff member to receive this directive.

24

25

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 39
(Cause No. 3:11-cv-05117-BHS)                    STOEL RIVES LLP
70847029.1 0023502-00065                         ATTORNEYS
                                                 600 University Street, Suite 3600, Seattle, WA 98101
                                                 Telephone (206) 624-0900

1   11. DATE:  February 25th, 2009, Singled Out LS to be called off 15 minute break

2

3       INDIVIDUAL/S CONCERNS DISCUSSED WITH:  SC

4       INSTANCE: LS reported off to Charge Nurse, CJ, and went to break room for 15 minute

5   break. SC sent HUC to the break room with the directive to return to Unit now per Manager's

6   directive. LS returned to Unit (with cottage cheese present in LS' s teeth) and was told that the

7   question the Physician had had been answered by RN, LR.  LS went into SC' s office and

8   stated," I had reported off to the Charge Nurse and was on break, ,so why was my 15 minute

9   break interrupted?"  SC responded, "Your 15 minute break can always be interrupted, it is your

    30 minute lunch that you can take undisturbed."

10  OUTCOME:  LS inquired of the RN staff (LR, S©C, CJ, RD and FL) if SC, Manager or TL,

11  Director, pulls them off their 15 minute breaks and all stated that when they were able to take

12  their breaks, they enjoy their breaks uninterrupted. Fifteen minute breaks are not to be

13  interrupted per Union, WSNA, and Labor agreement.

14

15

16  12. DATE: March 17th, 2009:  Singled out LS as not making correct Staffing decision when in
    Charge position on Saturday, March 14th, 2009.

17

18      INDIVIDUAL/S TO WHOM CONCERN DISCUSSED:  SC

19      INSTANCE:  SC called LS into her office on March 17th,2009 and told LS, "You did not cut

20  staff on Saturday, March 14th, 2009 when you kept 2 RNs and 1 PCT on duty."  LS responded

21  that the patients present on the Unit had high acuity needs and that the majority of them needed

22  transfer to In-House beds as opposed to discharges to home. Transfers can require 2 staff

23  members and 1 RN must remain on the Unit at all times. LS acknowledged that there was a

24  Student Nurse in the Preceptor role and that a Student Nurse is never to be considered as Staff
    when making assignments.

25

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 40
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 45 of 111

1    OUTCOME:  SC restated to LS, "You should not be in the Charge position if you allow

2    overstaffing. You should have cut the PCT. Your incorrect staffing cost this Unit too much." Of

3    fact, LS keep note of staffing decisions by the other RN staff when they were in Charge position

4    on Saturdays and the patient census on the Unit was at 7 patients. In all cases, staffing was kept

5    at 2 RNs and 1 PCT. In particular, LS noted that on July 11th, 2009, there were 7 patients on the

6    Unit and staff was kept at 2 RNs and I PCT by the Charge RN and the PCT on that Saturday was

7    on Overtime having worked the 8 hours prior on 11-7 shift. LS reviewed with RN Co-workers

8    (LR, RD) who did Charge position on Saturdays if they received criticism for the staffing

9    decisions on Saturdays and no one had received criticism or negative input from SC, Manager or

     TL, Director.

10   13. DATE: April 22, 2009 , Singled out LS by SC to "immediately receive report from PACU

11   (Post Anesthesia Care Unit).

12        INDIVIDUAL/S CONCEN DISCUSSED WITH:  SC

13

14        INSTANCE:  At 12:30PM on April 22nd, 2009, LS received seventh patient. At 14:30PM, LS

15   was in discussion with EG, Physician Assistant, concerning a problem with her patient and the

16   need for clarification of an order, when SC, Manager, stated to LS, "You need to take report

17   NOW from PACU. LS looked at phone and there was no call on hold. The phone rang at that

18   time and SC answered and put the call on hold and stated again to LS in a critical manner, "Take

19   this call NOW." LS picked up the phone and the RN on the line stated to her, "I was put on hold

20   so fast I did not get a chance to say that I actually need to speak to the HUC to check on a room

21   assignment." LS responded to the RN, "Please, get the RN who can give me report on the

22   patient that is to come out to room 421." (421 was not cleaned as yet and would require at least

23   20 minutes before patient could be received ). At 14:50PM, SC sent RN working the Short Stay

24   side home Low-Census. SC directed LS to receive a transfer patient in room 420. This patient

25   presented with an empty PCA (Patient Controlled Anesthesia) narcotic pump and in addition to

26   LS assessing and teaching this patient, the patient needed a cervical collar to be obtained and

     fitted. LS then received the patient from PACU in room 421. After moving the patient from the

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 41
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

Exhibit 1, Page 46 of 111

1   gurney into his bed, LS provided him with care, assessment and teaching and completed the

2   required documentation.

3   OUTCOME:  SC treated LS in a critical and disrespectful manner and  directives resulted in

4   LS being late in giving Shift Report to the oncoming staff and put LS in overtime for which LS

5   was again criticized for having overtime and costing the Unit too much.

6

7

8   14. DATE: April 28th, 2009  Singled out LS for not making assignment correctly.

9   INDIVIDUAL/S WITH WHOM CONCERN DISCUSSED:  SC

10

11   INSTANCE:  There were 8 patients on the Unit with 2 RNs and 1 PCT. The assignment was

12   made based on the directive SC had given LS that when there was 1 PCT staff, the PCT was

   assigned all patients for care and the patients were divided between the two RN staff members.

13   SC arrived on the Unit at 08:00AM after this assignment was in place. SC announced that LS

14   had made the assignment wrong. SC stated that "My directive for no RN to be assigned Primary

15   Care only applies on Saturdays."  SC then changed the assignment and placed 1 RN on primary

16   care for 2 patients and assigned LS six patients with the 1 PCT.

17   OUTCOME:  Again, LS was treated in a critical manner and made LS feel singled out for

18   "making the wrong decision" in front of her Peers even though LS was following the Directive

19   that SC had given to her and SC had not at any time clarified that her Directive only applied to

20   staffing on Saturdays.

21

22   15. DATE: May 8th, 2009  Singled out LS for mandatory Weekend change and removal from

23   Charge Position even though LS had Seniority.

24

25   INDIVIDUAL/S WITH WHOM CONCERN DISCUSSED: SC

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 42
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1    INSTANCE:  LS was informed by SC, Manager, that LS's schedule was being changed

2    permanently to the opposite weekend starting with the next Schedule.  LS was informed that LS

3    would not be in Charge position even though LS had Seniority.

4    OUTCOME:  When a change in weekend schedule occurs due to Management's directive and

5    this results in the RN working two consecutive Saturdays in a row, the RN receives Consecutive

6    Weekend pay as stipulated in the contract between the Union, WSNA and TGH.  On June 4th,

7    2009, SC told LS that SC could schedule LS off Saturday, June 13th, 2009 (thus preventing the

8    need to pay LS Consecutive Weekend pay).  LS responded to this offer by letting Manager, SC,

     know that LS needed to work her scheduled FTE.

9

10   OUTCOME:  On June 10th, 2009,  SC issued a STEP III Discipline to LS based on a Student

11   Nurse complaint that SC had requested of the student to put in writing. This complaint was

     lodged May 6th, 2009. Thirty four days had passed since the student complained that she had had

12   a poor learning experience while assigned with LS. No prior Progressive Discipline of a STEP 1

13   or a STEP 11 had ever been issued to LS concerning any previous issues with effective teaching.

14   LS was given the most severe level of discipline with a three day suspension without pay.  SC,

15   by issuing this suspension to LS on June 10th, 2009, took LS off the schedule that had LS

16   scheduled to work two Saturday shifts in a row per Management's decision and not due to LS's

17   request and thereby eliminated the Consecutive Weekend pay LS would have received for

     working her scheduled shifts.

18

19

20   16. DATE: June 10th, 2009  Singled out LS as being non-therapeutic concerning requesting

21   family member to allow staff to "Return the patient" on arrival from PACU.

22

     INDIVIDUAL/S WITH WHOM CONCERN DISCUSSED:  SC, manager, NO, Manager

23

24   INSTANCE:  AT 14:30PM, LS had received report from PACU on patient coming to Room

25   425. LS was asked by a family member, of the patient coming to Room 425, as to when the

26   patient would arrive. LS gave the family member a condition report of "PACU reports he has

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 43
(Cause No. 3:11-cv-05117-BHS)

70847029.1 0023502-00065          STOEL RIVES LLP
                                  ATTORNEYS
                          600 University Street, Suite 3600, Seattle, WA 98101
                                  Telephone (206) 624-0900

1   done well coming out of Anesthesia and that her loved one was just now being transported and

2   would be arriving within approximately 10 minutes". LS informed the family member that on

3   the patient's arrival, staff would transfer him into the bed and would be assessing his condition

4   and needs and that it was best to remain outside the room or at the comfortable chairs in the

Waiting Room at the end of the hall. The family member replied that she would remain outside

5   the room. LS was friendly and positive in her interaction and expressed gratitude to her for

6   understanding and obtained a large comfortable chair from out of the patient's room for the

7   family member's comfort as she waited and allowed the staff to provide the best care to the

8   patient.

9      OUTCOME: SC brought LS into her office at 15:30PM and stated to LS, "This is an

10  example of you being non-therapeutic, I overheard you tell your patient's family member to wait

11  outside the room so that you could assess your patient on arrival out of PACU." SC went on to

12  say, "We are a patient/family focused Hospital and our staff are responsible to ensure this

happens." LS responded, "What about HIPAA regulations that staff are to obtain permission

13  from the patient as to who they want to know their private information?", and LS asked "What

14  about limiting number of people in the room for safety reasons for the post-operative patients

15  who can be at greater risk?" ( Swine Flu precautions) LS presented that it is her 30 practice and

16  the ongoing practice of all staff on the Ambulatory Care Unit that family and friends are asked to

17  remain outside of room when staff is 'Returning or receiving a patient', and that LS had not been

18  told verbally or by Email of any new Policy that addresses change in established practice. SC

19  responded, "I have NOT (told any staff members of this change in practice) but I will certainly

remind everyone of the expectations at our next staff meeting." During the time period June

20  10th,2009 up until LS was Terminated Without Just Cause on December 1st, 2009, SC had not

21  told any other staff members that they could not continue their practice of requesting family and

22  friends of returning patients to remain outside of patient's room so that staff could assist their

23  loved one. In fact, per PCT, RF 's testimony , during the time period December 1st, 2009 to

24  present day, no staff has been criticized or been told of this expectation that she has ever

25  observed or been told of; "only you Linda."

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 44
(Cause No. 3:11-cv-05117-BHS)

STOEL RIVES LLP
ATTORNEYS
70847029.1 0023502-00065
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 49 of 111

1   17.DATE: June 10th, 2009. Singled out LS with STEP III Discipline for Failure to create a

2   positive learning environment based on one Student Nurse's alleged depiction of events and with

3   no Progressive Discipline (no prior issue with PROVIDING INSTRUCTIONS AND CLINICAL

4   EXPERIENCE to students during the 8 months SC had been LS' s Manager and over the 30

5   years LS employed by TGH.

6   INDIVIDUAL/S WITH WHOM CONCERNS DISCUSSED: SC, MANAGER, NO,

7   Manager of PACU

8   INSTANCE: On May 6th,2009, LS was assigned to precept Student Nurse, CC. LS was not

9   introduced to the student by the Instructor, nor was LS informed by the student's Instructor what

10   clinical skills the student was instructed to obtain. The Student Nurse, CC, went with me after

11   Shift Report on my initial Patient Rounds. Following that, CC, was engaged with visiting with

12   my patient in Room 424 (CC shared with this patient that prior to going back to school, she

13   worked for a jeweler and had received recognition for being a "top seller"). LS heard this

14   conversation while LS was entering documentation in the Epic chart as LS stood in the hall

15   outside of Room 424. The Student Nurse came out of 424 and informed LS that she needed to

16   call and find out her Password so that she could work in Epic. The student also stated she had

17   "some assignments to do" in the computer. In addition to the time the student spent on the

18   computer, the student left the Unit on three occasions for extended periods of time and then was

19   back on Unit at 13:00PM.  It was at this time that LS actively engaged with the Student Nurse

20   and asked her if she would like to administer an IV (INTERVENOUS) Medication and she

21   replied, "Yes".  In LS' s thirty three year Nursing career, LS has taught a multitude of Student

22   Nurses, New Hires, Returning-to-work hires and Agency Nurses. Based on this knowledge and

23   experience, LS assessed that the Student Nurse did not seem to have an understanding of what

24   the clinical experience consisted of ("Hands- On" patient care) and how the clinical experience

25   can be of great benefit to the student to gain confidence and knowledge. After the IV

26   Medication, Ancef, was noted on the patient's Emar in the Unit's computer in the Medication

Room, the time and route were noted and the dose. The Medication was removed from the Pyxis

and Student Nurse, CC, with LS' s instruction ,mixed the Medication in a 50cc bag of Normal

Saline and labeled the bag with the patient's name, Room number, date and time and the name

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 45
(Cause No. 3:11-cv-05117-BHS)

70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 50 of 111

1   and dose of the Medication.  Once in the patient's room, after identifying the patient, LS
2   perceived that the student was hesitant to learn how to assess a Saline Lock and how to prime the
3   tubing and set the IV Pump. LS asked CC if she would feel more comfortable with her
4   Instructor. For LS personally, when she was a Student Nurse (3 years clinical experience at TGII
5   during her Nursing Education),always felt most comfortable with her Instructors and that was
6   how LS learned most effectively. Through LS's own Student Nurse experience and through
7   communications with other Nurse's and their relaying their own experiences, Student Nurses can
8   and do have many doubts, fears and accusations concerning the RN as a result of participating in
9   their clinical experience in an Acute Care Hospital setting. LS found it disheartening that CC,
10  Student Nurse interpreted my interactions with her in a negative way and that CC expressed that
11  she did not benefit from her learning experience. LS did try to do her best to allay CC's overt
12  display of anxiety. The 5 Rights of Medication were adhered to as they are each and every time
13  LS is involved in the administration of Medications and this is evident that in 33 years of
14  Nursing, LS has never had a medication error (refer to LS's employee Personal File). LS
15  believes that the experience the Student Nurse, CC, had is something that the student needs to
16  take some responsibility for, as well as, LS.  LS spent time with her patient following the event
17  of the Student Nurse being disengaged and anxious during her interactions with LS while in the
18  patient's room. LS  expressed to her patient that she was sad that the Student did not engage well
19  with LS and the experience of 'hanging an IV piggyback". LS expressed, also, that "I wish I
20  could have allayed her fears so that could have felt more confident in the clinical setting." My
21  patient expressed to me, "I feel sorry for the Student Nurse, but I saw you did your best to help
22  her." LS believes that she did fail CC when she did not request a meeting with the student's
23  Clinical Instructor so that a better outcome could have occurred. LS was dealing with several
24  stressors; timely documentations, a request for pain medication for one of my other assigned
        patients, a request for me to call PACU and to obtain report (SC had practice of openly
        criticizing LS if LS did not get report before PACU called a second time). LS was bewildered as
        to why Student Nurse, CC, manifested little investment in her clinical experience throughout the
        entire shift.
25
26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 46
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 51 of 111

1    OUTCOME:  On June 10th, 2009, thirty four days after the Student Nurse presented her

2    allegations, SC issued a STEP III Discipline without any prior STEP I or STEP II for Failure to

3    create a positive learning environment. In this Discipline, SC referenced back to January 21st,

4    2009 where LS was accused of being the sole cause of the patient's wife being upset due to LS

     asking her to allow her husband to be assessed on arrival from PACU ( of note, the PCT, R(E)F

5    also asked the patient's wife to allow staff to work with her husband) and SC referenced back to

6    February 4th, 2009, where LS was accused by SC of being the reason a young patient's Mother

7    was upset when her son had an emesis (threw up ) and had a scant showing of blood on his tissue

8    after he blew his nose and the patient's Mother stated, "I am exhausted. We had to wait over 6

9    hours in the ED and my son just got to his room this AM and she stated, "I have no faith in my

10   son's Doctor's attentiveness". LS filed Grievance Without Just Cause on June 11th, 2009 and

11   never got to go through any of the steps of the Grievance Process before being Terminated from

     her thirty one year employment with TGH on December 1st, 2009.

12

13

14   18. DATE: July 1st, 2009  Singled out LS when SC stated," Go apologize to the patient you just

15   transferred to Room 401 on 4J I".

16
     INDIVIDUAL/S TO WHOM CONCERN DISCUSSED:  SC, Manager, PH, Nurse Educator
17

18    INSTANCE: LS' s patient was assessed by LS at 1300PM to have a heart rate between 140-

19   150 beats per minute sustained. LS notified the patient's Physician and obtained order to move

     patient to a Telemetry bed on 4J I to be converted. LS tried twice to phone report to receiving

20   RN. Both RN' s had been interrupted. LS went to the patient's room to give RN, CP, report on

21   patient's AM medications and family notification. The Nurse Educator, PH, was in the patient's

22   room actively documenting in Epic. CP was called to the Nurse's Station to take a phone call. LS

23   had Discharge Papers WITH HER for the patient in room 429 who was waiting for his

24   instructions so he could proceed home. LS stated to CP that LS would assist a patient and then

     return. After helping 429, LS went to the Nurse's Station on the Ambulatory Care Unit to let the

25   HUC know that the patient's room could be cleaned and thereby helping have room prepared as

26

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 47
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 52 of 111

1  soon as possible to receive a patient from PACU. (of note LS had only 5 minute break all shift to

2  go the bathroom and drink cup of water). SC stated to LS, "You need to go apologize to the

3  patient you just transferred." SC stated to LS, "the patient said you made her feel that she wasn't

4  important." SC HAD NOT SPOKEN TO THIS PATIENT.  LS went immediately to the patient

   in Room 401 and stated to her, "I did not mean to cause you any anxiety when I said I was going

5  to go assist another patient". The patient stated to LS that she was not aware of any problem and

6  that she was thankful for my helping her and that she was feeling much better but had missed

7  lunch and could I arrange for her to have food?"

8
   OUTCOME:  Patient 's well-being and optimal health was provided for by LS' s interventions

9  and patient felt well and grateful to LS and hungry.

10
   LS believed that Nurse Educator, PH, had phoned SC and made this accusation as to the patient

11 feeling LS had made her feel unimportant. WHY would PH be compelled to make this kind of

12 statement to SC? LS again felt singled out and bullied and treated in a disparate manner by SC.

13

14

15 19. DATE: July 14th, 2009 Singled out LS by criticizing LS' s  intervention for her patient's

16 pain relief.

17 INDIVIDUAL/S TO WHOM CONCERN DISCUSSED: SC, AN, GRIEVANCE OFFICER

18 FOR WSNA UNION

19
   INSTANCE: SC stated to LS that SC felt that LS had not intervened with pain medication

20 quickly for the patient in Room 426 who needed additional pain medication intervention.  LS

21 reviewed the events as they occurred: Between 07:30 and 08:00AM, LS was doing first rounds

22 and had medicated two of her assigned patients, when her partner told her that their patient in

23 Room 426 had requested pain medication at 07:30AM and had not received it. LS had not been

24 paged (of note LS wears a Tracker at all times and the Tracker was in good working order) or

25 informed of this patient's request until the current time of 08:00AM. LS obtained the ordered

26 pain medication, oral Percocet tabs two (of note it was just the correct amount of time when oral

DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS TO PLAINTIFFS - 48
(Cause No. 3:11-cv-05117-BHS)
70847029.1 0023502-00065

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

Exhibit 1, Page 53 of 111